IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CHEYENNE SALES CO., INC.,

    Plaintiff,

v.                                        Civil Action No. 2:04CV74
                                                            (STAMP)
GALE NORTON, Secretary of the
United States Department of Interior,

    Defendant,

and

WEST VIRGINIA HIGHLANDS CONSERVANCY, INC.,

    Intervenor-Defendant.

**MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANT'S AND INTERVENOR DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT AND
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

I.  Background

This matter arises from surface coal mining activities conducted by the plaintiff, Cheyenne Sales Co., Inc. ("Cheyenne"), from 1977-1980 in Upshur County, West Virginia. In May 1992, the West Virginia Highlands Conservancy, Inc. ("WVHC") filed a citizens complaint alleging that the land affected by Cheyenne's surface mining operations at Permit No. 63-77 in Upshur County did not comply with effluent limitations and the basic hydrologic protection provisions of the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"). The Office of Surface Mining Reclamation and Enforcement ("OSM") notified the state regulatory authority, the West Virginia Division of Environmental Protection ("WVDEP"),

of the complaint.  The WVDEP declined to take enforcement action because it believed that its jurisdiction over the mine site had terminated.  OSM determined that the WVDEP's refusal to take action was arbitrary, capricious, or an abuse of discretion; conducted its own inspection; and issued a notice of violation to Cheyenne for discharging water from the mine site that exceeded the applicable effluent limitations.  Cheyenne contested OSM's enforcement action, contending that OSM lacked jurisdiction and that the citation was deficient because the mine site was not subject to the effluent limitations applied by OSM.  Following a hearing, Administrative Law Judge ("ALJ") David Torbett found that the notice of violation was properly issued.  Cheyenne appealed the ALJ's decision and on appeal, the Interior Board of Land Appeals ("IBLA") affirmed as modified. Subsequently, Cheyenne initiated this action against the defendant, Gale Norton, as Secretary of the United States Department of the Interior ("Secretary"),[1] and the intervenor-defendant, West Virginia Highlands Conservancy, Inc. ("WVHC"), pursuant to 30 U.S.C. § 1276(a)(2) to obtain judicial review of the IBLA's ruling.

Cheyenne filed a motion for summary judgment.  The Secretary filed a cross-motion for summary judgment.  WVHC also filed a motion for summary judgment.  Cheyenne responded to the motions for

---

[1]The Office of Surface Mining Reclamation and Enforcement is the agency responsible for exercising the authority of the Secretary.  30 C.F.R. § 700.4.

2

summary judgment of both the Secretary and WVHC.  No other responses or replies were filed.

Following review of the motions for summary judgment, and the response thereto, this Court finds that the Secretary's motion for summary judgment and WVHC's motion for summary judgment must be granted and that Cheyenne's motion for summary judgment must be denied for the reasons stated below.

## II. <u>Facts</u>

In April 1977, Cheyenne obtained Permit No. 63-77 from the State of West Virginia to mine a 46-acre site in Upshur County. The site had previously been mined in the 1960's, and severe water quality problems, including acid mine drainage, existed there when Cheyenne began re-mining it.  After Cheyenne's mining operations commenced, Congress passed the SMCRA and, on May 3, 1978, the mine site became subject to the initial program regulations that were promulgated pursuant to SMCRA.  <u>See</u> 30 C.F.R. §§ 710-725.  Those regulations included 30 C.F.R. § 715.17, "Protection of the hydrologic system."

In January 1981, the Secretary approved West Virginia's permanent regulatory program pursuant to 30 C.F.R. § 732.13.  Prior to the approval of the permanent program, Cheyenne's mining activities at the site were complete, although reclamation was not complete.  In April 1983, upon recommendation of a state inspector, West Virginia approved a partial release of Cheyenne's bond based

on its compliance with the backfilling and grading provisions of West Virginia Code § 20-6-1, et seq. and the inspector's finding that Cheyenne's operation was not responsible for deteriorating the water quality at the site. Following a written finding that Cheyenne was in full compliance with the applicable regulations, West Virginia granted final release of Cheyenne's bond in May 1987.

On May 22, 1992, the WVHC filed a citizens complaint alleging that the mine site at Permit No. 63-77 was in violation of the effluent limitations and hydrologic protection provisions set forth in 30 C.F.R. § 715.17. In its complaint, WVHC requested an inspection of the site pursuant to § 721.13 of the initial regulatory program and the issuance of a notice of violation ("NOV") to Cheyenne if the inspection confirmed the alleged violations. In the alterative, WVHC also alleged that the permanent regulatory program provisions at 30 C.F.R. §§ 816.41 and 816.42 were being violated and appropriate enforcement action should be taken pursuant to 30 C.F.R. § 842.

Upon receipt of the citizen's complaint, the OSM's Morgantown, West Virginia, Area Office ("MAO") issued a ten-day notice to WVDEP stating that if WVDEP failed to take appropriate action to remedy the alleged violation, a federal inspection of the surface coal mining site would be conducted. By letter dated June 11, 1992, WVDEP responded. WVDEP alleged that its final bond release action terminated OSM's jurisdiction over the site and that the effluent

4

limitations established in OSM's interim program regulations were not applicable to the site because they were more stringent than the Environmental Protection Agency's ("EPA") standards pursuant to the Clean Water Act ("CWA"). Additionally, WVDEP stated that final bond release was appropriate because West Virginia granted bond release on the basis of its pre-SMCRA State policy of releasing bonds on re-mining operations where the water quality is better than or equal to the pre-mining water quality.

Subsequently, MAO advised WVDEP that OSM found its response to the ten-day notice to be "arbitrary, capricious and an abuse of discretion under the approved State program." MOA noted that WVDEP failed to show that discharges from the Cheyenne permit site complied with the company's National Pollutant Discharge and Elimination System ("NPDES") permit effluent limitations at bond release. In addition, MAO noted that WVDEP's water sampling prior to the bond release indicated that the post-mining water quality appeared worse than the pre-mining water quality. Thus, MAO concluded that the State's failure to take action to correct the violations was inappropriate.

The WVDEP sought informal review by OSM's Deputy Director of the MAO's determination that the WVDEP's response was inappropriate. On informal review, the Deputy Director affirmed MAO's finding and ordered a federal inspection. On August 26, 1992, OSM inspected the Cheyenne mine site and determined that

untreated discharges of acid mine drainage in violation of the effluent limitations were exiting the site at two locations. Specifically, a discharge from Pond A in the southeast corner of the mine site field tested at pH 2.8, iron greater than 7.0 mg/l and manganese greater than 10.0 mg/l. Another discharge which flowed along the remnants of drainage Ditch B and exited the mine site in the vicinity of reclaimed Pond B tested at pH 3.2, iron greater than 7.0 mg/l and manganese greater than 10.0 mg/l. As a result, on August 26, 1992, OSM issued a notice of violation ("NOV") in which it cited Cheyenne for violating federal permanent program regulation 30 C.F.R. § 816.42 and West Virginia surface mining regulation § 38-2-14.5(b). The NOV required Cheyenne to install, operate, and maintain treatment facilities so that any water discharged from the site would comply with the effluent limitations in the NPDES permit and 40 C.F.R. Part 434.

When OSM inspected the site again in November 1992, it found that Cheyenne was operating adequate treatment facilities. Consequently, it terminated the NOV. However, the inspector noted that Cheyenne's "treatment measures must continue indefinitely."

### III. Discussion

This matter is before the Court for judicial review of a proceeding conducted pursuant to 5 U.S.C. § 554. See 30 U.S.C. § 1276(a)(2). Under the SMCRA, such review is "solely on the record made before the Secretary" and "the finding of the Secretary

if supported by substantial evidence on the record considered as a whole, shall be conclusive." 30 U.S.C. § 1276(b). Also, the reviewing court must give substantial deference to an agency's interpretation of its own regulations. Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994). The Court's task is not to decide which among several competing interpretations best serves the regulatory purpose. Id. Rather, the agency's interpretation must be given "'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Id. (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945)).

A.  Statute of Limitations

Cheyenne contends that OSM's federal enforcement action was barred by the five-year statute of limitations under 28 U.S.C. § 2462, the general federal statute of limitations. Under that provision, "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued." 28 U.S.C. § 2462. The Secretary argues that Cheyenne's statute of limitations claim must fail because the claim was not raised before the administrative agency and the claim was not pled. Further, the Secretary argues that 28 U.S.C. § 2642 is inapplicable in this case because the relief sought by Cheyenne is injunctive in nature and the violation at issue is continuing.

As a general rule, "it is inappropriate for courts reviewing appeals of agency decisions to consider arguments not raised before the administrative agency involved." Pleasant Valley Hosp., Inc. v. Shalala, 32 F.3d 67 (4th Cir. 1994). Although this rule is not a strict jurisdictional bar, see id., it is a prudential one which this Court invokes here. Because Cheyenne did not raise the statute of limitations issue before the administrative agency, this Court declines to address the issue for the first time on appeal.

B.  OSM's Regulatory Jurisdiction

Cheyenne argues that OSM lacked regulatory jurisdiction over Permit No. 63-77 to issue a notice of violation. ALJ Torbett ruled that jurisdiction over the mine site had not been terminated at the time that OSM issued the NOV. On appeal, the IBLA modified this ruling in light of its decision in LaRosa Fuel Co., Inc. v. OSM, 134 IBLA 334 (1996).[2] The IBLA held that OSM's jurisdiction had indeed terminated but that, based on the evidence in the record, OSM properly reasserted such jurisdiction to issue the NOV. Cheyenne now contests the finding by the IBLA that OSM properly

---

[2]In LaRosa, the IBLA held that a bond release based on a State's written finding that a mine operator has fully complied with the applicable rules and regulations terminates the jurisdiction of both the State regulatory authority and OSM in its oversight role. 134 IBLA at 350. The IBLA noted that jurisdiction terminates regardless of whether OSM agrees with the State's findings and decision to release bond. Id.

8

reasserted jurisdiction.[3] Following review of the record, this Court finds that the IBLA's conclusion that OSM properly reasserted jurisdiction is supported by substantial evidence.

The procedure for reassertion of regulatory jurisdiction over a reclaimed mine site is provided for in 30 C.F.R. § 700.11(d): "the regulatory authority shall reassert jurisdiction under the regulatory program over a site if it is demonstrated that the bond release or written determination referred to in paragraph (d)(1) of this section [finding that all requirements have been completed] was based upon fraud, collusion, or misrepresentation of a material fact." If the State declines to reassert jurisdiction following notification by the OSM of possible violations at a particular site, the State regulatory authority implicitly makes a finding that its decision to release bond was not based on fraud, collusion, or misrepresentation of a material fact. LaRosa, 134 IBLA at 351. When the State regulatory authority declines to reassert jurisdiction, OSM is required to determine whether that action by the State was "arbitrary, capricious or an abuse of discretion." Id.; see also 53 Fed. Reg. 44362. If OSM concludes

---

[3]The IBLA largely declined to address the issue of termination of jurisdiction. Rather, the IBLA seems to have found that LaRosa requires the conclusion that jurisdiction terminated in this case and thus focused its analysis on whether jurisdiction was effectively reasserted. Because the IBLA focused on the reassertion issue and because the Secretary has indicated her acceptance of the IBLA's ruling on termination, this Court's review will be limited to the issue of reassertion of jurisdiction.

9

that the State's action was arbitrary, capricious or an abuse of discretion, that conclusion must be based on a factual finding that the State's decision to release bond was indeed based on fraud, collusion or misrepresentation of a material fact.  Id.

In this case, on June 11, 1992, the WVDEP declined to reassert jurisdiction following receipt of a ten-day notice from OSM listing the nature of Cheyenne's alleged violations.  Subsequently, on July 9, 1992, the OSM issued a "Response to Ten-Day Notice" in which it acknowledged WVDEP's decision not to reassert jurisdiction and determined that such decision constituted an "inappropriate response."  The OSM explicitly found that WVDEP's decision not to reassert jurisdiction was arbitrary, capricious and an abuse of discretion.  Thus, the OSM asserted jurisdiction and took enforcement action itself by issuing an NOV to Cheyenne on August 26, 1992.

Cheyenne argues that although OSM made a written determination that WVDEP's response was arbitrary, capricious and an abuse of discretion, OSM failed to make the requisite underlying finding that the WVDEP's decision to release Cheyenne's bond in the first place was based on fraud, collusion or a misrepresentation of material fact.[4]  Cheyenne contends that because OSM never made an

---

[4]Cheyenne also takes issue with OSM's determination that WVDEP's response to the ten-day notice was arbitrary and capricious.  Cheyenne argues that OSM lacked enforcement authority over its mine site because WVDEP's response to the ten-day notice was not arbitrary, capricious or an abuse of discretion.  Cheyenne

explicit, written determination that the WVDEP's bond release decision was based on fraud, collusion or a misrepresentation of material fact, jurisdiction was not effectively reasserted. Cheyenne argues that as a result OSM had no authority to take enforcement action against Cheyenne. The Secretary argues, on the other hand, that a written finding was not required. The Secretary contends that OSM impliedly made a finding of fraud, collusion or misrepresentation of material fact that was sufficient to reassert jurisdiction.

In its 1996 decision in LaRosa, the IBLA discussed the procedures for reasserting jurisdiction under 30 C.F.R. § 700.11(d)(2). The IBLA stated that when OSM decides to reassert jurisdiction that decision must rest on OSM's "factual finding" that bond release was based on fraud, collusion or misrepresentation of a material fact. In the opinion that is before this Court for review, the IBLA acknowledged that in this case, OSM did not make such a "factual finding" in express terms.

---

contends that the State had "good cause" for declining to reassert jurisdiction and therefore took "appropriate action." The IBLA considered and rejected this argument. This Court affirms the IBLA's decision on this point because a permittee lacks standing to challenge a determination by OSM that the State regulatory authority made an inappropriate response to a ten-day notice. See Appolo Fuels, Inc. v. OSM, 144 IBLA 142, 146 (1998)("a permittee-operator lacks standing to challenge the conduct of this [ten-day notice] exchange between the Federal and State regulatory authorities"); see also 53 Fed. Reg. 26728, 26742 (July 14, 1988)("A ten-day notice is not an enforcement action. Instead, it is a communication device between [OSM] and the states.")

11

However, the IBLA also noted that OSM's decision to pursue enforcement action against Cheyenne was made in 1992 -- several years before the LaRosa case and the IBLA's statement that a "factual finding" is required. Accordingly, the IBLA ruled that an internal memorandum prepared by the MAO on July 9, 1992, and sent to the Chief of OSM's Branch of Inspection and Enforcement on July 23, 1992, contained sufficient analysis and objective evidence to show that OSM made the requisite demonstration that bond release was based on fraud, collusion or misrepresentation of material fact prior to issuing the NOV.

This Court finds that the IBLA's ruling is supported by substantial evidence. The MAO's memorandum shows that MAO was well aware that a finding of fraud, collusion, or misrepresentation of material fact was necessary to invoke jurisdiction. Further, the memo evidences that MAO recognized that a "misrepresentation of material fact" did not require "intentional wrongdoing." Rather, such misrepresentation can be established by "objective evidence relating to whether the reclamation plan was fully complied with and completed at the time of bond release, and, in certain instances, can be inferred from an examination of the site on which jurisdiction was terminated." 163 IBLA at 52 (citing 53 Fed. Reg. 44356, 44362, col. 3 (Nov. 2, 1988)). "If an operator applies for release but has not fulfilled his objections he is guilty of misrepresentation by the very fact of making an application."

12

National Wildlife Federation v. Lujan, 950 F.2d 765, 770 (D.C. Cir. 1991). The objective evidence documented in MAO's memorandum reveals that Cheyenne was not meeting effluent limitations without treatment when the State regulatory authority released Cheyenne's bond. West Virginia believed that Cheyenne was complying with all initial regulatory program requirements when it approved bond release. Because Cheyenne was, in fact, not complying with the requirements, bond release was based on a misrepresentation of material fact.

To the extent that Cheyenne's jurisdictional arguments can be construed as challenges to IBLA's interpretation of 30 C.F.R. § 700.11(d)(2), the IBLA's interpretation is due substantial deference. Nothing in the plain language of 30 C.F.R. § 700.11(d)(2) requires that a finding of fraud, collusion, or misrepresentation of material fact be made explicitly or in writing. Rather, all that is required under the regulation is that a bond release based on a misrepresentation, fraud or collusion be "demonstrated." Thus, the IBLA's interpretation that, pre-LaRosa, such a demonstration could be impliedly made on the basis of objective evidence is not unreasonable.

Accordingly, because the IBLA's ruling is supported by substantial evidence and because its interpretation of 30 C.F.R. § 700.11(d)(2) is reasonable, the IBLA's ruling that OSM properly reasserted jurisdiction to issue the NOV to Cheyenne is affirmed.

C.  Hydrologic Protection Standards and Effluent Limitations

Cheyenne argues that even if OSM had jurisdiction to issue the NOV, the regulations that OSM cited in its NOV are inapplicable to Cheyenne. Specifically, Cheyenne contends that OSM's permanent regulations, EPA's effluent limitations, and OSM's interim program regulations are all inapplicable to its mine site at Permit No. 66-73. The IBLA found that OSM's interim regulations at 30 C.F.R. § 715.17 applied and that Cheyenne's mine site violated those regulations. Additionally, although the IBLA did not rule on the applicability of OSM's permanent program regulations, which incorporates EPA's effluent limitations for post-mining areas, the IBLA noted that the discharges from Cheyenne's mine site would violate those regulations "if applicable."[5]

The IBLA's ruling that the NOV was properly issued is not plainly erroneous or inconsistent with OSM's regulations. By its terms, SMCRA was to be implemented in two stages: (1) an initial or "interim" regulatory program, 30 C.F.R. §§ 710-725 and (2) a permanent regulatory program, 30 C.F.R. § 730, et seq. The initial regulatory program under SMCRA became applicable to coal extraction conducted after May 3, 1978. The permanent regulatory program

---

[5]The IBLA stated that Cheyenne was in violation of 30 C.F.R. § 816.42 of the permanent program regulations if that provision applied to Cheyenne by virtue of 30 C.F.R. § 710.11(e) which provides that where permanent program performance standards are less stringent than initial program ones, a mine operator may satisfy the initial program regulations by complying with the permanent regulations.

14

became applicable to coal extraction that continued eight months beyond the approval of a state permanent program under SMCRA or the implementation of a federal program for the state. See 30 C.F.R. § 701.11. West Virginia's permanent regulatory program under SMCRA was approved effective January 21, 1981. Accordingly, all coal mining operations conducted in West Virginia where coal was extracted after September 22, 1982, became subject to the permanent regulations as implemented by West Virginia's permanent program. Because Cheyenne began coal mining operations in May 1977 and completed them prior to September 22, 1982, the mine site governed by Permit No. 63-77 was subject to the interim regulations.

Cheyenne argues that because the NOV cited 30 C.F.R. § 816.42 of the permanent program and 40 C.F.R. § 434 of the EPA regulations as the provisions violated by Cheyenne, there was no underlying regulatory basis for the NOV. The IBLA recognized, however, that "OSM cited § 816.42 because the effluent limitations differ somewhat between the permanent program regulations and the initial program regulations." 163 IBLA at 54. In other words, OSM cited the permanent regulation because the standard was arguably less stringent than the interim program regulation.[6] Under 30 C.F.R.

---

[6]For sites in the post-mining stage, the permanent standard incorporates the EPA standards under 40 C.F.R. § 434, which imposes limitations only on pH and settleable solids levels. See 30 C.F.R. § 816.42. The interim program regulations, on the other hand, impose additional limitations for iron and manganese. See 30 C.F.R. § 715.17.

15

§ 710.11(e), a mine operator subject only to the interim regulations may satisfy its regulatory obligations by complying with either the initial regulations or the permanent regulations. In this case, the IBLA determined, and substantial evidence supports the determination, that the discharges from Cheyenne's mine site violated both the initial regulations and the permanent regulations (to the extent that Cheyenne's election under 30 C.F.R. § 701.11(e) might make them applicable).

Cheyenne also contends that the initial regulations are not applicable because 30 C.F.R. § 715.17 did not establish a numerical effluent limitation that can be applied to its operations at Permit No. 63-77. Cheyenne argues that the decision in <u>In re Surface Mining Regulation Litigation</u>, 627 F.2d 1346 (D.C. Cir. 1980) prohibits OSM from applying 30 C.F.R. § 715.17 to Cheyenne because Permit No. 63-77 was not an "active mining area" as defined by the EPA rules on August 26, 1992. Although the IBLA did not specifically address this argument in its decision, the IBLA stated that "[t]o the extent Cheyenne's arguments have not been specifically addressed, they have been considered and are rejected." 163 IBLA at 61. This Court similarly rejects the argument. Contrary to Cheyenne's contention, the effluent limitations set forth in the interim regulations at 30 C.F.R. § 715.17(a) have never been struck by a court, withdrawn, or superceded. <u>In re Surface Mining Regulation Litigation</u> addressed

only the issue of whether certain variances and exemptions that were omitted from the regulation must be included to conform with EPA practice. The effluent limitations themselves were not at issue and therefore remain valid and applicable to Cheyenne.

Additionally, Cheyenne cannot escape application of the federal initial regulations by relying on the standard applied by West Virginia when it released Cheyenne's bond. That standard, known as the "Columbo amendment," provided that bond release could be granted upon a finding that the quality of the untreated water discharge is equal to or better than the pre-mining water quality. See W. Va. Code § 22A-3-23 (1984). However, at the time that West Virginia released Cheyenne's bond, this "equal to or better than" standard had previously been disapproved and superceded by the OSM. See 50 Fed. Reg. 35082 (Aug. 29, 1985). Thus, this Court agrees with the IBLA's determination that "it was not reasonable for Cheyenne to expect that effluents as good as those before it began re-mining would be regarded as meeting the requirements of the initial regulatory program . . ." 163 IBLA at 53 n.10.

Generally, the SMCRA requires operators, at a minimum to "minimize the disturbances to the hydrologic balance at the mine site and in associated off site areas and to the quality and quantity of water in surface and ground water systems both during and after surface coal mining operations and during reclamation . . ." 30 U.S.C. § 1265(b)(1). Further, the interim regulations

provide the following effluent limitations for mining and reclamation operations: iron not greater than 7 milligrams per liter, manganese not greater than 4 milligrams per liter, total suspended solids not greater than 70 milligrams per liter, and a pH within the range of 6 to 9. 30 C.F.R. § 715.17(a). Similarly, the permanent regulations provide pH shall be within the range of 6 to 9. 30 C.F.R. § 816.42 (incorporating 40 C.F.R. § 434). In this case, the field measurements taken by OSM at Cheyenne's former mine site far exceeded these limitations.

The IBLA's determination that the initial regulatory standards apply to Permit No. 63-77 is not plainly erroneous or inconsistent with those regulations. Additionally, substantial evidence supports the finding of the IBLA that the discharges from the mine site were significantly more acidic than the range provided for in <u>both</u> the permanent regulations (if applicable) and the initial regulations. Regardless of which regulatory standard is applied, the record shows that Cheyenne's mine site was not meeting any of the parameters absent treatment.

D. <u>Pond A and Drainage Ditch B</u>

Cheyenne contends that even if the initial regulations apply to Permit No. 63-77: (1) the discharge emanating from Pond A is not a discharge from an area subject to OSM's jurisdiction since coal removal was completed prior to the effective date of SMCRA and (2) the discharge from drainage Ditch B is not a "point source" to a

18

water of the United States as required under the Clean Water Act ("CWA"). Both of these arguments were properly rejected by the IBLA.

First, under SMCRA, the OSM may assert jurisdiction not only over land from which coal is being excavated, but also from "adjacent land the use of which is incidental" to surface coal mining activities. 30 U.S.C. § 1291(28)(B). Here, Cheyenne was utilizing the land that encompasses and drains into Pond A (the "eastern side") for a haul road to transport coal mined from the western side. Because this activity occurred after the effective date of SMCRA and because it constitutes activity "incidental" to surface coal mining activities, the discharge from Pond A is subject to OSM's jurisdiction.

Second, although enforcement of SMCRA must be in compliance with the CWA where the CWA regulates, the SMCRA can and does address water issues unaddressed by the CWA. See In Re Surface Mining Regulation Litigation, 627 F.2d at 1367 ("Congress certainly recognized in the Surface Mining Act that the EPA's existing regulatory authority under the Federal Water Pollution Control Act was deficient with respect to surface coal mining, in that EPA could not directly regulate discharges from abandoned and underground mines or from nonpoint sources . . ." Thus, "[t]he Act gave the Secretary authority to regulate in these areas . . ."). The fact that the "B seep" is not a "point source" that flows to

19

waters of the United States as required by the CWA, is not relevant here. Rather, the initial regulatory provisions provide that all "discharges from areas disturbed by surface coal mining" must comply with certain minimum effluent limitations regardless of whether such discharges are from a "point source." See 30 C.F.R. § 715.17.

## IV. Conclusion

Based on the foregoing reasons, the decision of the Interior Board of Land Appeals is AFFIRMED. Accordingly, it is ORDERED that defendant Secretary of the United States Department of Interior's motion for summary judgment is GRANTED, the West Virginia Highland Conservancy, Inc.'s motion for summary judgment is GRANTED and the plaintiff Cheyenne Sales Co., Inc.'s motion for summary judgment is DENIED. Further, it is ORDERED that this civil action be DISMISSED and STRICKEN from the active docket of this Court.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum opinion and order to counsel of record herein. Pursuant to Federal Rule of Civil Procedure 58, the Clerk is DIRECTED to enter judgment on this matter.

DATED:     March 9, 2007

                               /s/ Frederick P. Stamp, Jr.
                               FREDERICK P. STAMP, JR.
                               UNITED STATES DISTRICT JUDGE